# FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA

MAY 0 8 2020

U.S. CLERK'S OFFICE
TERRE HAUTE, INDIANA

AHMAD M. AJAJ,
    PLAINTIFF,

Civil Action No. 2-20-cv-244-JPH-MJD

v.

J.E. KRUGER, MICHAEL UNDERWOOD, JASON COX, TIMOTHY HUNT, ROBERT ROLOFF, T. WATSON, CHRISTOPHER McCOY, MELISSA KIMBERLY, K. LUBBEHUSEN, MICHAEL GILLIAM, JASON DODGE, DAVID FLOYD, MITCHEL HOLLIDAY, SCOTT ABRAHIMS, JONATHAN SUTTER, Bureau of Prisons.

    DEFENDANTS.

## PLAINTIFF'S VERIFIED COMPLAINT

TO THE HONORABLE JUDGE OF THIS COURT:

COMES NOW, Plaintiff Ahmad M. Ajaj, pro se, and respectfully submits this Complaint for violations of his constitutional and statutory rights:

### A. PARTIES

1. Plaintiff Ahmad M. Ajaj is a federal prisoner in the custody of the Federal Bureau of Prisons and currently incarcerated in USP-Allenwood in Pennsylvania.

2. Defendant J.E. Kruger was the Warden of U.S. Penitentiary (USP-Terre Haute) in Terre Haute, Indiana. He is sued in his **individual capacity.**

3. Defendant Michael Underwood is an Associate Warden of USP-Terre Haute, 4700 Bureau Road South, Terre Haute, IN 47802. He is sued in his **individual capacity.**

4. Defendan Jason Cox is an Associate Warden of USP-Terre Haute, 4700 Bureau Road South, Terre Haute, IN 47802. He is sued in his **individual capacity.**

5. Timothy Hunt is an Associate Warden of USP-Terre Haute, 4700 Bureau Road South, Terre Haute, IN 47802. He is sued in his **individual capacity.**

6. Defendant Robert Roloff is the Chaplian and is in charge of religious services department at USP-Terre Haute, 4700 Bureau Road South, Terre Haute, IN 47802. He is sued in his **individual capacity.**

7. Defendant Christopher McCoy is the Health Services Administrator of USP-Terre Haute, 4700 Bureau Road South, Terre Haute , IN 47802. He is sued in his **individual capacity.**

-1-

8. Defendant Melissa Kimberly is the Assistant Warden of USP-Terre Haute, 4700 Bureau Road South, Terre Haute, IN 47802. She is sued in her **individual capacity**.

9. Defendant K. Lubbehusen is a Nurse at USP-Terre Haute Haute, 4700 Bureau Road South, Terre Haute, IN 47802. She is sued in her **individual capacity**.

10. Defendant Michael Gilliam was the Assistant Food Services Administrator of USP-Terre Haute, 4700 Bureau Road South, Terre Haute, IN 47802. He is sued in his **individual capacity**.

11. Defendant David Floyd is the Inmate Trust Fund Supervisor for USP-Terre Haute, 4700 Bureau Road South, Terre Haute, IN 47802. He is sued in his **individual capacity**.

12. Defendant Mitchel Holliday is the Chief Dietician for the Bureau of Prisons, he is responsible for overseeing the nutritional management of the inmates in the Bureau of Prisons custody, including Plaintiff, he is assigned at the Federal Medical Center, P.O.Box 4600, Rochester, Minnesota 55903. He is sued in his **individual capacity**.

13. Defendant Scott Abrahims is the National Food Services Administrator for the Bureau of Prisons, he has a direct supervision over the food service program for prisoners, including the Plaintiff, he is assigned at the Central Office, Federal Bureau of Prisons, 320 First Street, NW, Washington, DC 20534. He is sued in his **individual capacity**.

14. Defendant Jonathan Sutter is the Life Connections Program Chaplian for USP-Terre Haute, 4700 Bureau Road South, Terre Haute, IN 47802. He is sued in his **individual capacity**.

15. Defendant Federal Bureau of Prisons is an agency of the United States charged with the administration of federal prisons. The BOP maintains physical custody of Plaintiff and records pertains to him.

15(a). Defendant T. Watson is the Warden of USP-Terre Haute, Terre Haute, IN 47802. He is sued in his **individual capacity**.

15(b). Defendant Jason Dodge is a Unit Manager at USP-Terre Haute. He is sued in his **individual capacity**.

## B. JURISDICTION

16. This Court possesses subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(4), the Administrative Procedure Act, 5 U.S.C. § 702, RFRA, 42 U.S.C. § 2000bb-1(c), the Freedom of Information Act, 5 U.S.C. § 552, the Privacy Act, Conspiracy to interfere with civil rights, 42 U.S.C. § 1985, Action Neglect to Prevent Conspiracy, 42 U.S.C. § 1986, and Bivens v. Six Unknown Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971).

17. Venue is proper within this district pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to the claims occurred in this judicial district.

## C. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
(RFRA, 42 U.S.C. § 2000bb Violations)

**a. Refusal to Accommodate Religious Fasting Against Defendants Kruger, Underwood, Cox, Hunt, Roloff, McCoy, Watson, Kimberly, Floyd, and Gilliam:**

18. Plaintiff is a devout Sunni Muslim. His religious beliefs have been constant and unwavering throughout his life, including his years spent incarcerated.

19. Plaintiff's years of administrative remedies filed in an effort to observe his religious faith demonstrate his firm belief in Islam.

20. Defendant BOP's annual "Inmate Skills Development Plain" for Plaintiff consistently identifies him as an "active participant" of the Islamic faith.

21. The BOP Chaplain confirmed in writing that Plaintiff is sincere in his religious beliefs.

22. "Sunnah" means the actions, commands, traditions, acts of worship, examples, deeds and saying of the Prophet Mohammad (PBUH), to which Muslims are commanded in the Qur'an, to follow his Sunnah and abstain from what he is forbids.

23. Every Muslim has been ordered by Allah to follow the Sunnah of Prophet Mohammad (PBUH) as he is the Messenger of Allah and an exemplary example for mankind to follow due to his words and actions being inspired by Allah. (See, e.g., Holy Qur'an 33:21, 46:9, and 47:33).

24. Fasting during certain holy days throughout the Islamic calendar year is one of the most important practices of the Sunnah of Prophet Mohammad (PBUH).

25. The Sunnah fasts requires Muslims not to ingest any food, medications or anything else from dawn until sunset.

26. From January 2018 to February 2019, Plaintiff was incarcerated at USP-Terre Haute in Terre Haute, Indiana.

27. While incarcerated at USP-Terre Haute, Plaintiff repeatedly explained to Defendants Kruger, Watson, Underwood, Cox, Hunt, Roloff, McCoy, and Gilliam that the Prophet Mohammad preaches that Muslims will be rewarded and blessed by Allah for their participation in the Sunnah Fasts.

28. Defendants Kruger, Underwood, Cox, Hunt, Roloff, McCoy, Watson, and Gilliam refused to provide Plaintiff with his meals or medications outside fasting hours during the observance of the Sunnah Fasts.

29. Defendant Kruger, Underwood, Cox, Hunt, and Gilliam refused to provide Halal food before sunrise and after sunset during the Sunnah fasts nor allowed him to take back to his cell any food item from the food services to consume outside fasting hours during the observance of the Sunnah fasts.

30. Defendant Kruger, Underwood, Cox, Hunt, Watson, Kimberly, Floyd, and Roloff refused to authorize him purchase food items complies with his sincerely held religious dietary laws and medical dietary to enable him to perform the Sunnah Fasts.

31. From January, 2010 to May 2012, while Plaintiff was incarcerated at USP-Marion, Defendant Roloff was the Chaplian at USP-Marion and during that time, he also refused to accommodate Plaintiff's Sunnah Fasts.

31. The Defendants deprived Plaintiff of the ability to perform the Sunnah Fasts and deprived him of the ability to receive blessing and rewards by Allah for performing the Sunnah fasts, denied him spiritual growth and religious enjoyment, and denied him the purification of his soul that he would be received through the actual fast practice itself.

32. The Defendants' refusal to accommodate the Sunnah Fasts substantially burdened Plaintiff's right to exercise his sincere religious belief by forcing him to choose between taking his prescribed medications and be fed and performing the Sunnah Fasts.

**b. Refusal to Accommodate the Holy Month of Ramadan Against Defendants Kruger, Underwood, Cox, Hunt, Roloff, Kimberly, Lubbehusen, Floyd, Abrahims, and Sutter:**

33. Plaintiff hereby incorporates all prior paragraphs of this complaint as if fully set forth herein.

35. Ramadan is a holy month during which Muslims must fast. Fasting is one of the Five Pillars of Islam.

36. In order to observe the fast, Muslims must not ingest anything, including food or medication, from dawn until sunset, so long as taking medication outside of fasting hours will not have an adverse effect on their health. Also, critical to the observance of Ramadan that Muslims only consume halal foods outside of fasting hours, perform the nightly group Tarawih prayers,  engage in Quranic recitation and other rituals, and perform good deeds and charitable acts.

37. Muslims believe that during the Holy month of Ramadan rewards are multiplied, and sins are multiplied as well. Muslim must avoid all kinds of sins, not to engage in negative behavior, foul language, provactive acts, arguments, and any act that interferes with the fast.

38.  On May 15, 2018, the Holy Month of Ramadan was started while Plaintiff was  incarcerated at USP-Terre Haute.

39. While incarcerated at USP-Terre Haute, Plaintiff repeatedly requested that Defendants Kruger, Underwood, Cox, Hunt, Roloff, and Abrahims to provide him Halal foods to enable him to comply with the religious requirements of the fast but they refused to provide him with Halal foods that comply with his religious mandate.

40. Plaintiff also repeatedly requested that Defendant Kruger, Underwood, Cox, Hunt, Roloff, Kimberly, and Floyd to allow him to purchase Halal foods, including Halal meat items, that comply with his sincerely held religious dietary laws and his medical dietary restrictions but they refused.

41. During 2018 Ramadan Fast, defendants Kruger, Underwood, Cox, Roloff, and Sutter refused to

allow Plaintiff to perform the nightly group Tarawih prayers with other Muslim prisoners.

42. On May 17, 2018, When Plaintiff and other Muslim prisoners performed the nightly group prayer, Defendant Kruger responded to the performance of the peaceful prayer by threatening the Plaintiff and other Muslim prisoners of the use of force including the use of OC gas, stun devices, and non-lethal guns. After Defendant Kruger made his threats, approximately 15-20 Muslim Prisoners withdrawn their participation in Ramadan for fear that they will be physically harmed by prisons officers.

43. Defendants Kruger, Underwood, and Cox ordered their staff to subject the Plaintiff and Muslim prisoner to pat searches after they break their fast for the purpose of harassing, humiliating, and discourge them from practicing their religious beliefs.

44. During the Holy Month of Ramadan, Defendant Lubbehusen repeatedly denied Plaintiff his prescribed medication to deliberately inflict pain and suffering upon him and to make it difficult for him to be able to fully participate in devotional acts of worship that accompany the Ramadan fast, including meditation, reciting the Qur'an, performing additional prayers, and carry-out his daily activities without pain and suffering.

45. In addition, Defendant Lubbehusen forced the Plaintiff to choose between his medically prescribed medications and his rights to practice his religious belief without being subjected to humiliation, harassments, threats of physical and mental harm, and without being deprived of the qualitative spiritual  experience of Ramadan fast and without being distracted from the spiritual uplifting aspect of the Ramadan fast.

46. Defendants Kurger, Underwood, Cox, Roloff, and McCoy refused to take any action to protect Plaintiff from the unlawful acts of Defendant Lubbehusen, forcing him to fast without taking his medically prescribed medications.

46. The anti-Muslim harassment and unlawful acts described above constituted a substantial burden on Plaintiff's religious practices because it constituted indirect coercion to betray Plaintiff's religious beliefs. It also prevented Plaintiff from performing worship acts in the manner required by the Qur'an and the teaching of the Prophet Mohammad. Also deprived him of the ability to receive blessings and rewards by Allah, denied him spiritual growth and religious enjoyment, and substantially diminished qualitative spiritual experience, and unlawfully offended Plaintiff's religious beliefs and rituals.

**c. Refusal to Accommodate Eid Al-Fitr And Eid Al-Adha Celebrations Against Defendants Kruger, Underwood, Cox, Roloff, Kimberly, and Floyd:**

47. Plaintiff hereby incorporates all prior paragraphs of this complaint as if fully set forth herein.

48. The Eids are ones of the most significants days of the Islamic Calender. Observance of the Eids are religiously mandated in the Islamic faith.

49. Eid Al-Fitr is a religious holiday to celebrate the end of the Holy Month of Ramadan. Eid Al-Adha is a significant religious holiday celebrated by Muslim to honor the Prophet Ibrahim's willingness to sacrific his fist-son Ismail as an act of submission to God's command and his son's acceptance of being sacrificed.

50. Observance of Eids includes participating in a religious halal meal with halal sweets. The Eids are important Muslim festival. Eating halal foods, including halal meat, is a central requirement during the observance of the Eids.

51. The yearly Memorandum from the Bureau of Prisons regarding the "Guidelines for Ramadan, Islamic holy days and observances" states "for institutions that use funds from the Chaplaincy Services Department budget to provide traditional/ritual food items to supplement the ceremonial meal, halal lamb meat would be most appropriate for the Muslim ceremonial meal".

52. Plaintiff repeatedly asked Defendants Kruger, Underwood, Cox, Roloff, and Kimberly to accommodate the observance of the Eids by take the necessary actions to ensure that halal religious meal be served to him or to allow him to obtain the required food items with his own money.

53. Defendants refused to take any action to ensure that a religious halal meal be served to Plaintiff or he be allowed to obtain the required food items for the celebration of the Eids with his own money.

54. Plaintiff also asked Defendant Floyd , the Inmate Trust Fund Supervisor, to allow him to order halal food items that complies with his sincerely held religious dietary laws with his own money but he denied his requests.

55. Granting Plaintiff's the requested religious accommodation for the observation of the Eids would have minimal effects on correctional staff and prison resources.

56. Defendants substantially burdened plaintiff's exercise of his religion by depriving him of the religiously required halal foods for the Eids.

**d. Refusal to Accommodate Plaintiff's Religious Dietary Laws by Serving him Halal Meals Against Defendants Kruger, Underwood, Cox, Hunt, Roloff, Gilliam, Holliday, and Abrahims:**

57. Plaintiff hereby incorporates all prior paragraphs of this complaint as if fully set forth herein.

58. Islamic faith require observant Muslims to consume only Halal food.

59. Islamic doctrine dictates that non-Halal (haram or "forbidden") food destroys the spirituality and morality of the consumer. A Muslim who consumes non-Halal food is termed a "faasiq" (dissolute) and he is considered a flagrant sinner. The prayers of a person eating haram food are rejected for forty days.

60. Islamic dietary laws requires Muslims to stay away from consuming food items with Mashbooh (questionable) ingredients that might be from non-halal source and to stay away from unhealthly foods.

61. In order to be considered halal, food must not contains any non-halal ingredient and not come in contact with haram food or pork at any stage, including fruit or vegetables grown in soil fertilized by hog manure, or other animals raised on pork-by-products or haram products in their feed.

62. The Holy Qur'an states "And eat of the things which Allah has provided you, halal and good, and fear Allah in whom you believe". (Surah 5:88).

63. The Islamic religious diet is a halal diet with halal meat as made clear by the Holy Qur'an and the Sunnah of Prophet Mohammad (PUH). The Islamic expert, Hajj Habib Ghanim, Sr., of the Islamic Society of Washington area ("ISWA") stated that "almost all Muslim meals usually have meat, poultry and fish for protein but those meats/poultry must be halal slaughtered"..

64. To meet the requirements of halal food, herbivorous animals and birds must be fed, raised and slaughtered according to Islamic dietary laws. It is not permissible to consume even non-meat products prepared in factories that also process pork, haram meats, or haram products.

65. All ingredients for food must be halal. Items used in haram foods can contaminate halal foods, thereby making those foods haram.

66. Defendants Kruger, Underwood, Cox, Hunt, Roloff, Gilliam, Holliday, and Abrahims were repeatedly made aware of Plaintiff's sincerely held dietary laws and they were informed both verbally and in writing that their refusal to provide Plaintiff a halal diet violates the Islamic faith and deprives him of his right to partake in a fundamental tent of Islam..

67. The Defendants' refusal or inaction to ensure that Plaintiff was served meals complied with his sincerely held religious dietary laws meant that he was confronted with a Hobson's choice at every meal-he must choose whether to eat or to observe his religion.

68. Defendants provided other inmates with religious and specialized meals on a daily basis but they refused but they refused to provide Plaintiff with meals complied with his sincerely held dietary laws.

69. The Defendants' refusal or inaction to ensure that Plaintiff was served meals complied with his sincerely held religious dietary laws was not reasonably related to legitimate penological interests but instead was the result of intentional discrimination against Plaintiff and his Islamic faith.

70. From August 2018 until October 2018, the Food Services Administrator Mr. Ismael Oliver provided Plaintiff with halal meal fully complied with his sincerely held religious dietary laws and his medical dietary restrictions.

71. In October 2018, Defendants Holliday, Abrahims, Hunt, Cox, and Underwood directed the Food Services Administrator to immediately stop serving Plaintiff halal meals complied with his sincerely held religious dietary laws and medical dietary restrictions for no legitimate reason other than to deliberately inflict pain and suffering upon the Plaintiff and to retaliate against him for filing grievances and other legal actions.

72. Defendants Holliday and Abrahims directed the BOP employees to continue to deprive him of a diet complies with his religious dietary laws and his medical dietary restrictions to deliberately and

-7-

maliciously inflict pain and suffering upon him and to force him to consume foods violates his sincerely held religious dietary laws and his medically prescribed dietary restrictions.

73. In compliance with Defendants Holliday's and Abrahims' orders, the BOP employees are still refusing to serve Plaintiff with a diet complies with his sincerely held religious dietary laws and his medically prescribed dietary restrictions.

74. As a result of Defendants' acts or omissions, Plaintiff has suffered harm and continues to suffer harm.

75. Defendants' acts and omissions are the direct or proximate cause of the deprivation of Plaintiff's rights under RFRA.

76. Defendants substantially burdened Plaintiff's sincerely held religious beliefs when they intentionally deprived him with a diet complies with his religious dietary laws and his medically prescribed dietary restrictions.

**e. Refusal to Accommodate Plaintiff's Religious Dietary Laws by Repeatedly Denying His Requests to Purchase With His Own Money Foods Complies With Both His Sincerely Held Religious Dietary Laws and His Medically Prescribed Dietary Restrictions Against Defendants Kruger, Underwood, Cox, Hunt, Watson, Roloff, Kimberly, and Floyd and They Also Denied His Requests to Order Halal Non Food Items**

77. Plaintiff hereby incorporates all prior paragraphs of this Complaint as if fully set forth herein.

78. Plaintiff firmly believes that his faith mandates that he consume purely halal food, including halal meat.

79. Plaintiff provided all defendants with a detailed information about his religious dietary laws.

80. Plaintiff also provided all the Defendants with a list of over fifty vendors that sells halal products complies with his sincerely held religious beliefs, including one, Halalco, which is already approved as a vender for state and federal prisons.

81. The Federal Bureau of Prisons has a Special Purpose Order (SPO) designed to provide the inmate population a means to purchase hobby craft items and supplies, religious items and other items not routinely sold in the commissary.

82. While Plaintiff was incarcerated at USP-Terre Haute from January 2018 to February 2019, Plaintiff repeatedly requested that the above named Defendants use their authority to ensure that he be allowed to purchase with his own money halal products, including halal meat items, that complies with his sincerely held religious laws.

83. All Defendants refused to allow Plaintiff to purchase halal products, including halal food items that met his sincerely held religious requirements and his dietary medical restrictions and they deprived him of the ability to comply with his religious laws.

84. All the Defendants were repeatedly made aware that under Plaintiff's religious dietary laws, consuming non-halal food is a flagrant sin that invalidates his acts of worship, inhibits his spiritual development, and weakens his relationship with Allah.

85. The Defendants substantially burdened Plaintiff's ability to practice his religion without any legitimate

justification.

**f. Defendants Kruger, Underwood, Cox, Sutter, Roloff, and Watson Unjustifiably Denied Plaintiff Access To Islamically Qualified Sunni Imam:**

86. Plaintiff hereby incorporates all prior paragraphs of this complaint as if fully set forth herein.

87. As a devout Muslim, Plaintiff must meet regularly with a qualified Sunni Imam who is a follower of the correct Sunni Doctrine and Beliefs (Aqidah).

88. Islamic law mandates regular consultation with an Imam to ensure compliance with religious teachings and religious values in daily life.

89. An Imam is the primary Islamic religious leader who leads others in formal prayers, outlines lessons from the Qur'an by explaining its meaning and application in the daily life of Muslims, gives religious advice and counseling on personal, family, and financial issues, helps Muslims apply the rules of Islam to daily life, and builds Muslim community and fellowship.

90. Plaintiff sincerely believes that an Imam provides him with much needed religious teachings, religious services, religious advice and counseling generally and, in particular, on the complicated spiritual challenges that prison presents.

91. On information and belief, for years, the USP-Terre Haute has operated without a Muslim Chaplian, a a Muslim Religious Counselor, or any full-time Muslim Religious Services Department Staff to provide religious services to Muslim inmate population.

92. USP-Terre Haute employs full-time Chaplains for other religious groups but none for Muslims. Also volunteers of other faiths were and are regularly allowed to provide religious guidance to inmates.

93. While Plaintiff was incarcerated at USP-Terre Haute, no religious Muslim volunteers were approved or allowed to provide religious guidance to Inmate-Muslim population at USP-Terre Haute.

94. During Plaintiff's confinement at USP-Terre Haute, the BOP had at least thirteen full-time Islamic chaplians (imams) in various institutions across the country.

95. While he was incarcerated at USP-Terre Haute, Plaintiff repeatedly requested that Defendants Kruger, Watson, Underwood, Cox, Sutter, and Roloff provide him access to an Imam or one of the readily available Islamic Chaplains that is a follower of Sunni Doctrine and Beliefs but they denied all his requests without any legitimate justification and in violation of the BOP's own policies.

96. The Defendants deprived Plaintiff access to an Imam for more than a year in a violation of his sincerely held religious beliefs which requires him to have interaction with an Imam at least once a week.

97. On August 16, 2018, the Defendants imposed a contract individual from an obscure sect which subscribes to beliefs that Prophet Mohammad and the Sunni religious scholars consider heretical and blasphemous as an Islamic Spiritual Guide to deliberately offend Plaintiff's and other Muslim prisoners' sincerely held religious beliefs.

98. All the Defendants were made aware long before imposing that individual as the Spiritual Guide for

Plaintiff and other Muslim Prisoners that his religious beliefs are directly contrary to the religious beliefs of Sunni Muslims and that they sincerely believes that they are required to avoid his Islamically offensive beliefs and teachings.

99. All the defendants were also made aware that if they attends that individual's religious meetings, they would violate their sincerely held religious beliefs by listening to teachings they Islamically considers blasphemous.

100. Most importantly, all the Defendants were told by Plaintiff and other Muslim Prisoners that none of them shares that individual religious beliefs  and imposing him as their Islamic Spiritual Guide is same as asked an athiest to lead the Islamic daily prayers.

101. Prior to selecting that person as the Islamic Spiritual Guide, all the Defendants were aware that his religious beliefs are considered by Islamic Sunni faith and the Sunni Muslim theologians heretical and blasphemous because he has previously been employed as a contract Imam and Islamic Spiritual Guide by the BOP and in 2017 his contracts were not renewed and numerous complaints were filed by the Muslim prisoners against him and they strongly objected to having him as their Imam and Islamic Spiritual Guide.

101. The Defendants deviated from normal hiring procedures and the credentials requirements of the BOP in hiring him as Islamic Spiritual Guide and Imam.

102. After the Defendants imposed him as the Islamic Spiritual Guide and Imam, the Plaintiff and other Muslim prisoners repeatedly complained to the Defendants that he was deliberately making statements to offend their sincerely held religious beliefs but they refused to take any proper action to ensure that their sincerely held religious beliefs were respected, and instead, threatened them that they would be removed from the Life Connections Program (LCP) if they did not attend his so-called Islamic Spiritual Guide classes in a clear violation of 28 C.F.R. § 548.15, RFRA, and the Establishment Clause of the First Amendment.

103. All the Defendants were made aware that when faced with teachings that are blasphemous, offered by someone who purports to be Muslim, Sunni Muslims believe they must either prevent themselves from hearing the teachings or speak out against them.

104. All the Defendants refused to provide access to other readily available Sunni Chaplians (Imams), who are BOP employees, or access to other Sunni Imams who shares the same religious beliefs of the Sunni Muslim prisoners, including the Plaintiff, without any legitimate justification.

105. Plaintiff repeatedly requested that the Defendants allow him to contact mosques and Islamic Centers in Indiana in order to recruit Sunni Islamic volunteers to serve the Muslim population at USP-Terre Haute but they denied his requests.

106. The Defendants substantially burdened Plaintiff's exercise of his religion by denying him access

to readily available Imams shares his sincerely held religious beliefs without any legitimate justification.

### g. Defendants Kruger, Underwood, Cox, Sutter, Watson, Rolff frequently interfered with Plaintiff's ability to perform the obligatory weekly Jumu'ah Prayer

107. Plaintiff hereby incorporates all prior paragraphs of this complaint as if fully set forth herein.

108. Jumu'ah obligatory prayer is an important service for Muslims. It is a congregate prayer performed every friday after the sun reaches its zenith and before Asr prayer (afternoon prayer).

109. There is no alternative means of attending Jumu'ah because it is not a prayer that can be performed individually and requires khutba (sermon) followed by prayer.

110. The Bureau of Prisons' own training materials recognize that the attendance at the congregational prayer is obligatory on all men in the Islamic faith and commanded by the Qur'an and the Sunnah of Prophet Mohammad.

111. While Plaintiff was confined at USP-Terre Haute, Defendants Kruger, Underwood, Cox, Sutter, Watson and Roloff substantially burdened his ability to practice his religion by repeatedly depriving him of the ability to perform the Jumu'ah prayers and services without any legitimate justification.

112. Plaintiff repeatedly complained to each Defendants about the unlawful patterns of interfering with obligatory Jumu'ah Services and prayers without any legitimate justification, but they refused to take any corrective action.

### h. Defendants Kruger, Underwood, Cox, Watson & Roloff deprived the Plaintiff of the Talim (Islamic Study Group)

113. Plaintiff hereby incorporates all prior paragraphs of this complaint as if fully set forth herein.

114. The Federal Bureau of Prisons allows inmates of all faith groups congregated religious programs including religious study groups.

115. The Islamic faith mandates that all Muslims seek religious knowledge. In Islam, spiritual guidance comes from studying the Qur'an, the Sunnah of Prophet Mohammad, the practices and rulings of early Muslims, and the guidance and "consolation" of those with expertise in the Islamic faith.

116. The Sunni Islam requires access to both literary and human resources in order to determine required, commended, neutral, reprehensible, encouraged, and prohibited acts in various contexts.

117. Under the BOP's own policy, Defendant Roloff "must establish and conduct a well-rounded programs of religious instructions for all inmates in the institution including classes, correspondence, work, and discussion groups, which involves the assistance of additional personnel, both staff and civilian volunteers ... [and to insure] the institution's religious program is in

compliance with accreditation standards ... [and] motivation of inmates want to learn must be encouraged and developed".

118. The BOP's own policy also requires Defendant Roloff to have "knowledge of available resources within the local community and the skill to develop and schedule their participation in the institution's religious program"

118. The Sunni Islamic faith emphasizes the importance of attending Talim (Islamic Study Group).

119. Plaintiff repeatedly explained to defendants Kruger, Underwood, Cox, and Roloff that his sincerely held religious beliefs requires him to attend Talim.

120. While Plaintiff was confined at USP-Terre Haute the Defendants cancelled the Islamic Study Group without any legitimate justification and without any violations of any rules by the Muslim inmates, including the Plaintiff.

130. The Defendants also refused to provide any qualified Sunni Imam or Islamic volunteer to provide spiritual guidance or Islamic classes for Plaintiff and other Muslim prisoners while at the same time provided Chaplains, contract religious advisors, and volunteers to provide religious guidance and religious study groups to other religious groups at USP-Terre Haute.

131. The Defendants substantially burdened plaintiff's ability to practice his religion by depriving him of Talim and other religious programs.

**i. Defendants Kruger, Underwood, Cox, and Roloff substantially burdened Plaintiff's exercise of his religion by denying him access to all his religious items during his placement in the Special Housing Unit without any legitimate justification**

132. Plaintiff hereby incorporates all prior paragraphs of this complaint as if fully set forth herein.

133. While Plaintiff confined at USP-Terre Haute from January, 2018 to February, 2019, Defendants Kruger, Underwood, Cox, and Roloff promulgated and implemented a policy of prohibiting Muslims housed in Special Housing Unit to have access to prayer rug, prayer beads, kufi, watch, to know the time for the daily five prayer, halal food items, Qur'an, prayer oil, and other religious materials without any legitimate justification.

134. 28 CFR § 548.16, states that "inmate religious property includes but is not limited to rosaries and prayer beads, oils, prayer rugs, phylacteries, medicine pouches, and religious medallions".

135. 28 CFR § 541.21 (8), states that "staff **shall** provide the inmate opportunity to possess religious scriptures of the inmate's faith".

136. In February 2018, Plaintiff was placed in the Special Housing Unit and the observation room at USP-Terre Haute for non-disciplinary reasons, and he was denied access to all his religious materials and access to a prayer rug, prayer beads, kufi, watch, Qur'an, prayer oil, and halal food items.

137. In addition, he was prevented from comply with the obligatory requirements for the performing of his daily prayers, and he was subjected to religious abuses.

138. Plaintiff complained to Defendants Kruger and Roloff but they refused to take any corrective action.

-12-

139. All the Defendants substantially burdened Plaintiff's ability to practice his religion by promulgated and implemented a policy that deprives his of his religious needs and rights.

**j. Defendants Kruger, Underwood, Cox, Hunt, McCoy, Lubbehusen, and BOP substantially burdened Plaintiff's exercise of his religion by refusing to exempt him from unnecessary strip searches and pat searches by the opposite gender:**

140. Plaintiff hereby incorporates all prior paragraphs of this complaint as if they fully set forth herein.

141. The BOP's Practical Guidelines for Administration of Inmate Religious Beliefs and Practices, T5360.01, states that "the only person of the opposite gender who may be in physical contact with a Muslim is the spouse".

142. 28 CFR § 511.16(b)(3), states that "whenever possible, pat searches of your person will be performed by staff members of same sex. Pat searches may be conducted by staff members of the opposite sex only in emergency situations with the Warden's authorization".

143. It is forbidden for Muslims to permit a femal staff member to perform any type of pat search.

144. Many courts have held that staffing concerns precipitating cross-gender pat searches are insufficient to advance a compelling government interest.

145. While Plaintiff confined at USP-Terre Haute, at no time any Nurse, except Lubbehusen, left her post for the purpose of joining other officers to conduct pat searches.

146. Defendant Lubbehusen was singling out for the random pat searches, the Muslim and Black prisoners for pure racist reasons.

147. While Plaintiff was confined at USP-Terre Haute from January, 2018 to February 2019, Defendant Lubbehusen repeatedly singled him out for deliberately provocative and humiliating pat searches to offend his sincerely held religious beliefs, and she always denied his request that the pat search be conducted by readily available male officers.

148. In addition, Defendant Lubbehusen performed the pat searches in a manner offensive to Plaintiff's sincerely held religious beliefs by touching his private parts.

149. Plaintiff repeatedly asked Defendants Kruger, Underwood, Cox, Hunt, McCoy, Watson and others to protect him from defendant Lubbehusen's racist harassment, mistreat, and religious abuses.

150. None of the defendants took any effective steps to protect plaintiff from Lubbehusen.

151. As a Muslim, Plaintiff is not permitted to be seen naked by strangers. Under the Islamic faith, a male Muslim is prohibited from exposing the area of his body between the navel and the knees. This area is islamically called awrah. Exceptions to this Islamic prohibition exist for showing awrah to one's spouse, for medical treatment, or for other circumstances of necessity that does not includes strip searches.

152. Defendant BOP's own policy allows exemption from strip searches for transgender inmates but not for religious reasons. Bureau of Prisons' Program statement No. 5200.04, states that "institutions should consider using available body scanning technology in lieu of visual searches of transgender

inmates". The Program statement also states that "Transgender inmates may request an exception to
[pat searches]. The exception must be specifically described (e.g. "pat search only by femal staff")".

153. USP-Terre Haute has a full body scanning technology while Plaintiff was confined at that
facility.

154. Defendants BOP,Kruger,Underwood,Cox,Watson,&Hunt refused to exempt plaintiff from strip searches
because of his religious beliefs despite the fact that all BOP institutions, including USP-Terre Haute,
have a full body scanning technology.

155. All the Defendants permitted their staff to repeatedly subjecting Plaintiff to humiliating and
demeaning strip searches without any legitimate justifiction.

156. despite repeated complaints to the defendants, Plaintiff was repeatedly ordered to remove all his
clothing and then the officers inspected his body, ears, hands, feet, back of his neck, inside his
mouth, and inside of his nose. The Officers also required him to run his fingers through his hair, bend
over, and squat so that the officers can look at his anal area. He also must lift his genitals so
that area is visible to the officers.

157. On many occassions, Plaintiff was subjected to three strip searches during one movement and despite
the fact that he was under constant supervision by the escorting officers from the time of the first
search to the third and despite the fact thata full body scanning technology was readily available
and much more effective in detecting contraband than strip searches because it detect contraband and
weapons hidden **on or in** a person's body.

158. During his more than (27) years of confinement, Plaintiff has no history of concealing contraband
or weapon to justify strip searches.

159. In addition, Plaintiff's sincerely held religious beliefs prohibits him from using or possessing
drugs and he has no history of doing so.

160. The Defendants imposed substantial burden on Plaintiff's sincerely held religious beliefs because
they required him to engage in conduct that seriously violates those beliefs.

161. The defendants did not and could not carry their burden of showing that strip search is the least
restrictive means of achieving any compelling governmental interest.

162. In fact, 28 CFR § 552.11, states that "inspection of an inmate's person using electronic devices
(for example, Metal Detector, Ion Spectrometary device, or body imaging search device) does not require
inmate to remove clothing).

**k. Defendants Kurger, Underwood, Cox, Hunt, and Roloff substantially burdened Plaintiff's
    exercise of his religion by banning the performance of the obligatory group prayers**

163. Plaintiff hereby incorporates all prior paragraphs of this complaint as if they fully set forth
herein.

164. Plaintiff sincerely believes that he is required to pray in congregation with at least two other

Muslims his five daily obligatory prayers for approximately five minutes each prayer.

165. There are requirements according to Islamic tradition for performing prayer. Islamic prayer requires purification, meaning I have to be clean by performing a wudu, or ritual ablution, clean area and not to be performed in trash areas; in a pathway; where non-halal food is being consumed, or near a bathroom. Prayer also requires concentration without distractions such as music being played, and the area should be free from images and pictures.

166. According to Islamic tradition, the only time Plaintiff is permitted to pray in his cell that a toilet is when he is on lockdown and that is because he has no other option.

167. From January 29, 2018 to February 23, 2018, Defendants Kurger and Roloff prevented Plaintiff from performing his daily obligatory group prayer in the manner prescribed by his faith without any legitimate justification.

168. From February 23, 2018 to February 7, 2019, Defendants Kurger, Underwood, Cox, Hunt, Sutter,Watson and Roloff refused to allow the Plaintiff to perform all his five daily obligatory group prayers and only allowed him to perform group prayers during the time he was outside his cell in the designated prayer room.

169. From January 29, 2018 to February 7, 2019, defendants Kruger, Underwood, Cox, Hunt,Watson and Roloff prohibited the performance of any of the five daily obligatory group prayers in any area other than the designated prayer room in the Life Connections Program ("LCP") without any legitimate justification.

170. Other Federal and State prisons and jails allows Muslim prisoners to perform their daily congregational prayers in their housing units and all other areas outside the housing units.

171. In **Lindh v. Warden, Federal Correctional Institution, Terre Haute, Indiana,** Civil Action No. 2:09-cv-00215-JMS-MJD, the Honorable Judge Jane Magnus-Stinson, found that the Warden for the same complex "failed to establish either that the ban [on group prayer] is justified by a compelling interest or that it is the least restrictive means to further a compelling governmental interest.

172. On May 17, 2018, when Plaintiff and other Muslim prisoners began to peacefully perform the last obligatory daily prayer (Isha prayer) during the holy month of Ramadan, Defendants Kurger, Underwood, and Cox, while defendant Roloff was present, order their staff to issue a direct order to Plaintiff and other Muslim prisoners to immediately stop praying and threatened them with use of force and the use of pepper spray, stun devices, and non-lethal guns on them if they ever attempted to pray again without any legitimate justification other than their prejudice toward the Islamic faith.

173. Defendant Roloff had a history of preventing Muslim prisoners from performing their daily obligatory prayers and issuing and directing other to issue disciplinary actions against Muslim prisoners for performing their daily obligatory prayers peacefully.

174. All the Defendants substantially burdened Plaintiff's exercise of his sincerely **held** religious beliefs by preventing him from performing his daily obligatory prayers in the manner prescribed by his religion.

**1. Defendants Kurger, Watson, Underwood, Lubbehusen, Cox, Hunt, and Dodge acted in concert with each other to unlawfully remove Plaintiff from a religious program (the Life Connections Program):**

175. Plaintiff hereby incorporates all prior paragraphs of this complaint as if fully set forth herein.

176. On February 23, 2018, Defendant BOP assigned Plaintiff to the Life Connections Program ("LCP"), a unique religious program and housing unit with a designated room for group prayer.

177. While in LCP, Plaintiff was allowed to pray with other Muslims for **some** of the five daily obligatory group prayers (salat), one of the Five Pillars of the Islamic faith.

176. In 2018, Defendant BOP represented to another court that Plaintiff would be able to complete the LCP-an eighteen-month program.

177. Defendant BOP also indicated to that Court that Plaintiff would be able to stay in the LCP unit past the eighteen-month term (if not longer).

178. Plaintiff would have completed the LCP program at earliest on or around Aug., 2019.

179. While Plaintiff was assigned to the LCP, he exceeeded the requirements of the program and provided over **548 hours of community service helping childern with cancer**, and completed 10 educational courses.

180. In addition, I maintained clear conduct for approximately seven year with **zero** violation of any of the BOP's rules and regulations.

181. Prisoners accepted into LCP are meant to stay in the LCP until they complete the program.

182. On February 1, 2019, the BOP posted a memorandum on the bulletin board of the LCP unit that stated:

Effective Immediately: If you are in the Life Connections Program, you are expected to complete the program. If your points drop and you want to transfer without completing the program, you need to withdraw from the program and will be removed back to your parent unit. Your parent unit will determine if you are eligible for a transfer. If you transferred from another institution specifically for the program, a transfer referral to send you back to your facility will be submitted. if you transferred here specifically for the program and are expelled, a referral back to your prior facility will be submitted. This is not a topic for discussion. This is how it will be. If you do not want to complete the program, we will move you out so we can move people in that want to complete the program... D. Bedford-Case Manager.

183. Plaintiff had not told anyone that he did not want to complete the program, and he did not tell anyone that he wanted a transfer.

188. during the period between March 2018 and February 2019, Plaintiff repeatedly

complained, both verbally and in writing, to defendants Kurger, Underwood, Cox, Hunt, Dodge, Watson, McCoy, Roloff, Kimberly, BOP, and others about the patterns of unlawful acts by Nurse Lubbehusen including repeatedly offending his religious beliefs, inciting other inmates and staff against him, repeatedly depriving him of his prescribed medications and at one occassion gave him a wrong medication that made him sick, humiliting him in the presence of other inmates and staff, subjecting him to physical and mental pain and suffering, and singling him out for harassment and other abusive acts without any legitimate justification other than hatred toward Plaintiff and his Islamic faith.

189. During the same period, plaintiff also filed numerous administrative remedies against Lubbehusen and about other serious violations at USP-Terre Haute.

190. Plaintiff also complained to defendants about criminal acts by the officers at USP-Terre Haute including the patterns of unjustified use of excessive force, forcing rival inmates to be housed together in the Special Housing Unit which resulted in numerous injuries and at least the death of two inmates, including inmate Dan Stevens, who was killed by his cellmate in the SHU on or around January 2019, and about other racist acts by the staff at USP-Terre Haute.

191. Defendant Lubbehusen is known to inmates as a racist and a vicious abuser of inmates.

192. In fact, before the defendants initiated the retaliatory transfer process, Plaintiff was helping a fellow prisoner with the exhaustion of his administrative remedies and with preparing a lawsuit about his experience being set up by prison officers to beat up by another prisoner in the SHU. I was also filing my own administrative remedies related to prisoners being harmed and killed in the SHU. I even emailed the USP-Terre Haute officials and lawyers about this issues.

193. After a year of complaints against Defendant Lubbehusen's unlawful acts to deffendants and others, on January 11, 2019, with the approval of other defendants, Lubbehusen fabricated a formal stalking complaint against the Plaintiff.

194. During his 27 years behind bars, no one ever accused Plaintiff of stalking or any improper behavior toward femal staff, except Lubbehusen's fabricated complaint, despite the fact he has daily contacts with femal staff and other Nurses for more than "27" years.

195. In fact, BOP employees formally stated that Plaintiff is sincere in his religious beliefs and repeatedly femal Nurses and medical staff at USP-Terre Haute and other institution s reported, in writing, the good behavior of Plaintiff toward them.

196. Most importantly, it is against Plaintiff's sincerely held religious beliefs to stalk or behave improperly toward femals.

192. All the Defendants were fully aware that branding an inmate a stalker can expose him to serious harm or death. Inmate Dan Stevens, who was killed by his cellmate in the SHU, was placed in the SHU for alleged misbehavior toward a femal staff.

193. Upon information and belief, all the defendants were aware that Lubbehusen fabricated the stalking

-17-

complaint for the following reasons:

a) Long before Nurse Lubbehusen fabricated the stalking complaint, Plaintiff repeatedly asked the defendants take proper measures to protect him from any fabrication by her. For example, on 6-18-2018, approximately seven (7) months before she fabricated the complaint, Plaintiff filed a request for administrative remedy (BP.9), and he stated, among other things the following:

"On 5-28-2018, I was forced to choose between access to my prescribed pill-line medications and the ability to be protected from harm to my life and safety by Nurse Lubbehusen, who perviously on two different occassions served me completely crushed to powdered and diluted with water pills ... that made me sick, to choose between my medications and the ability to protect myself ... from her patterns of unlawful and racist acts toward me, her patterns of attempting to incite other officers against me to cause me harm ... to choose between access to my prescribed medications and her deliberate patterns of demeaning me and humiliating me in the presence of other officers and other inmates ... to choose between my medications and the ability to enjoy the fast and the special acts of worship for Ramadan ... **and to prevent her from fabricating incident report against me or using her friends to do so.** Due to the above and the complete failure of the administration, medical, and correctional staff, and the Chaplain to take any action to protect me from her patterns of racist and unlawful acts despite my numerous complaints to them, I am forced to stop taking my prescribed medications served by her and forced to endure unnecessary pain and suffering";

b) Long before Nurse Lubbehusen fabricated the stalking complaint, all the defendants were aware that the Plaintiff stopped going to pill-line for his prescribed medications just to avoid her whenever she was working;

c) Since April, 2018, Plaintiff filed countless administrative remedies and complaints against her and sought protection from her racist and unlawful acts toward her;

d) Since April or May 2018 (approx. seven month before the fabricated stalking complaint), Plaintiff repeatedly begged the defendants, both verbally and in writing, to keep her away from him, and he asked them to allow someone else to serve him his medications, but they denied all his requests and administrative remedies; and

d) In addition, Plaintiff never received an incident report for the alleged "stalking" and all his requests for a copy of the fabricated stalking complaint, including his FOIA request, were denied to prevent him from reviewing it and challenging it and because the defendants were aware no way he could be "stalking" her when he did everything he could to avoid her, including skipping his prescribed medications.

194. On February 8, 2019, defendants Kurger, Watson, Underwood, Cox, Hunt, and Dodge unlawfully used the fabricated stalking complaint as a justification to remove the Plaintiff from the Life Connections Program and transferred him to USP-Allenwood.

195. Shortly before his transfer, Plaintiff asked the Chaplain assigned to the LCP, Chaplain Sutter, if he was kicking him out of LCP. He told him that his transfer had nothing to do with the LCP and that the LCP staff had no knowledge of or input in transferring him.

196. Because the Defendants removed him from LCP when they transferred him, they prevented him from completing this religious program which is not available at USP-Allenwood.

197. USP-Allenwood also does not offer community services to help others, including children with cancer, and because of his unlawful transfer out of LCP, the defendants prevented him from fulfilling a religious duty of helping childerns with cancer and helping others (Plaintiff's left lung was removed

due to cancer), and they deprived him of the ability to receive blessings and rewards from Allah for helping others.

198. In addition, because the defendants removed the plaintiff from the LCP, he is no longer has access to group prayer room to perform his daily obligatory prayers whenever he is out of his cell.

199. Before Plaintiff was transferred to USP-Allenwood, he was allowed to perform some of his five daily obligatory group prayers with other Muslim inmates in the LCP's designated pray room whenever he was out of his cell. He did this for approx. a year with no incident report or violations. He has done nothing wrong to no longer be able to simply pray with other Muslims when the time for the daily prayer comes.

200. Because of the defendants' unlawful removal of Plaintiff from the LCP, he is no longer able to perform any of his daily obligatory prayers in the manner prescribed by his sincerely held religious beliefs.

201. Due to defendants' unlawful actions, when Plaintiff arrived at USP-Allenwood, he could not even pray alone in his cell because doing so required him to pray in an area with pictures on the wall (because his cellmate had pictures hanging up), which contrary to the requirements of the prayer. His cellmate also played music during the prayer, which he sincerely believe is also prohibited by Islamic tradition.

202. On March 10, 2019, Plaintiff declared a hunger strike to protest prison's refusal to provide a clean area to perform his daily prayers in the manner prescribed by his sincerely held religious beliefs. Plaintiff has never had to go on a hunger strike before just to perform his obligatory prayer.

203. Defendants substantially burdened Plaintiff's exercise of his sincerely held religious beliefs by  acting in concert with each other to unlawfully remove him from the Life Connections Program which resulted on the above mentioned religious deprivations.

**m. Defendants Kruger, Watson, Underwood, Cox, Hunt, Dodge, and BOP substantially burdened Plaintiff's exercise of his religion by not considering his religious beliefs and needs when they made their decision to remove him from the Life Connections Program and transfer him to another Penitentiary that does not accommodate his sincerely held religious beliefs and needs:**

204. Plaintiff hereby incorporates all prior paragraphs of this complaint as if they fully set forth herein.

205. Defendants' Policy No. 5100.08, states that "When designating an inmate to a non-federal facility for an inmate, designators **shall** consider the inmate's religious beliefs as one of the factors in making a designation decision. If possible, a non-federal facility where the inmate's religious beliefs can be accommodated will be designated if necessary, designators may consult with Central Office Chaplaincy staff in making this designation decision".

206. Defendant BOP does not take in consideration the inmate's religious beliefs as one of factors in

making a designating the inmate to another federal facility.

207. Defendants BOP, Kurger, Watson, Underwood, Cox, Hunt, and Dodge decided to ignore Plaintiff's religious beliefs and needs when they made the decision to transfer him to USP-Allenwood.

208. Prior to his transfer, Plaintiff informed all the defendants of his religious beliefs and he requested that they take the necessary actions to ensure they would be accommodated.

210. Prior to Plaintiff's transfer, all the defendants were fully aware that USP-Allenwood does not have an LCP or any similar religious program, that USP-Allenwood does not offer a community service program, that USP-Allenwood does not accommodate the fast of the holy month of Ramadan by serving Plaintiff's prescribed medications before dawn as required by his sincerely held religious beliefs, that USP-Allenwood does not provide access to Imam, that USP-Allenwood does not offer designated room to offer the daily obligatory prayers, does not accommodate Plaintiff's other religious needs that are described in this complaint.

211. All the defendants substantially burdened Plaintiff's exercise of his religion by transfering him to a place that they were made aware cannot accommodate his sincerely held religious beliefs.

**n. Defendant BOP, Kurger, Watson, Cox, and Underwood substantially burdened Plaintiff's exercise of his religion by blocking the e-mail addresses of Islamic organizations that provided inmates, including the Plaintiff, with educational religious information and answer to religious questions**

212. Plaintiff hereby incorporates all prior paragraphs of this complaint as if they fully set forth herein.

213. Since 2018, defendant BOP, Kurger, Watson, Cox, and Underwood blocked the e-mail addresses of Islamic organization that provided inmates, including the plaintiff, with educational religious information about topics such as the fast of the holy month of Ramadan, daily prayers, the Sunnah of Prophet Mohammad, the basic Pillars of the Islamic faith, and provided answer to religious questions without any violation of any of the defendants' rules and regulations and without any legitimate justification.

214. Defendants' action of unjustifiable blocking the e-mail addresses of Islamic organizations without any violation substantially burdened Plaintiff's exercise of his religion by depriving him of religious information and answer to his religious questions.

215. Upon information and belief, the defendants did not block non-Islamic organizations' e-mail addresses nor they banned anti-Muslim information and materials .

**o. Defendants' actions or inactions described in this complaint were motivated anti-Muslim animus and prejudice and substantially burdened Plaintiff's exercise of his religion:**

216. Plaintiff hereby incorporates all prior paragraphs of this complaint as if they fully set forth herein.

217. Plaintiff repeatedly notified defendants Kurger, Cox, Underwood, Cox, Hunt, Roloff, McCoy, Kimberly, Watson, Sutter, Gilliam, Abrahims, Holliday, and Floyd of the violations of his religious rights, but they took no action to remedy them.

218. Plaintiff repeatedly complained to defendants Kurger, Cox, Underwood, Hunt, Roloff, McCoy, Dodge, Kimberly, and Watson about the anti-Muslim harassment and actions by USP-Terre Haute staff, including Nurse Lubbehusen, but they took no action to stop them, thereby condoning, creating, and encouraging tolerance of the anti-Muslim harassment and hostility.

219. Defendants BOP, Kurger, Cox, Underwood, Hunt, Roloff, Dodge, Kimberly, Watson, Sutter, Gilliam, Abrahims, Holliday, Lubbehusen, and Floyd exhibited well-documented patterns of denying Muslims their religious rights and subjecting them to discriminatory treatment and religious deprivations.

220. Defendants BOP, Kurger, Cox, Underwood, Hunt, Roloff, Dodge, Kimberly, Watson, Sutter, Gilliam, Abrahims, Holliday, and Floyd treated other religious groups differently than Muslim.

221. Defendants Kurger, Cox, Underwood, Hunt, Watson, Dodge, McCoy, Kimberly, Roloff, and Watson tolerance of anti-Muslim harassment and the violations of their religious rights created a tense prison environment and caused Plaintiff to fear that he could be harmed because of his religious beliefs

222. During the period of plaintiff's confinement at USP-Terre Haute, Plaintiff and other Muslim prisoners were subjected to an atmospher of wide-spread anti-Muslim harassment and religious deprivat-ions.

223. The anti-Muslim harassment, hostility, and actions described in this complaint and plaintiff's administrative remedy filings constituted a substantial burden on his religious practice because, among other things, they constituted indirect coercion to betray plaintiff's sincerely held religious beliefs. They also prevented Plaintiff from performing worship acts in the manner required by the Qur'an and the teaching of the Prophet Mohammad. Also deprived him of the ability to receive blessings and rewards by Allah, denied him spiritual growth and religious enjoyment, and substantially diminished qualitative spiritual experience, and unlawfully offended Plaintiff's and other Muslims religious beliefs and rituals.

224. Defendants Kruger, Underwood, Cox, Hunt, Roloff, Kimberly, Watson, Floyd intentionally discriminated against Plaintiff and other Muslim prisoners by denying them the right to purchases halal products and religious items complies with their sincerely held religious beliefs while allowing adherents of other religious groups to purchases religious items and food products comply with their religious beliefs. In addition, Defendants Kurger, Underwood, Cox, Hunt, Kimberly, Watson, and Floyd made available to transgender inmates special products such as **Lady Speed Stick, Jergens Original Lotion, Foam Hair Rollers, St. Ives Body Wash, Mascara Black, Pink Blush, Eye Shadow (Sweet as Candy), Lip Gloss, Black Eyeliner, Foundation light, Hair Claw, Cotton Balls, women's Timex Watch, and Women's Twin Razor,** but refused to make available to Plaintiff and other muslim products required by their sincerely held religious beliefs.

225. defendants Kurger, Watson, Underwood, Cox, Hunt, Roloff, and Sutter intentionally discriminated against Plaintiff and other Muslim Prisoners by refusing to allow them access to readily available Imam and Muslim Chaplians follows their sincerely held religious beliefs and denied them access to

Muslim volunteers while other religious groups were provided full-time chaplains and access to religious volunteers , pastoral visits, and spiritual advisors.

226. defendants Kurger, Watson, Underwood, Cox, Hunt, and Roloff intentionally discriminated against Plaintiff and other Muslim Prisoners by refusing to allow them to perform obligatory group prayers in places such as the outside yard while at the same time allowed access to outside sweat lodge for prayer and allowed other adherents of other religious groups to worship together in the yard and other areas in the prison.

227. Defendants Kurger, Underwood, Hunt, Roloff, Gilliam, and Abrahims denied Plaintiff a nd other Muslim Prisoners religiously mandated halal diet while they provided the Jewish prisoners kosher meals fully comply with their religious dietary laws. They also provided special meals for pass over and other holidays but they refused to provide religiously mandated halal feast meals for the Islamic Eids.

228. Defendants BOP, Kurger, Underwood, Hunt, Cox, and Watson exempt the transgender inmates from strip searches and pat searches by male staff but they repeatedly denied Plaintiff's request to be exempt from strip searches and pat searches by female staff for religious reasons.

229. Defendants BOP, Kurger, Watson, Hunt, Roloff, Cox, Underwood, Sutter, Kimberly, Gilliam, Floyd, Holliday, and Abrahims respected and accommodated other religious traditions while singling out the Islamic faith for discriminatory treatment and religious deprivations motivated by their personal animus toward the followers of the Islamic faith.

230. The Defendants' policies and practices regarding  religious services, diet, property, and other religious matters favor inmates of other religions over Muslim inmates. In fact, defendant BOP's own administrative remedies record demonstrates wid-spread violations of the religious rights of the Muslim prisoners.

231. In May, 2018, Defendants Kurger, Underwood, and Cox directed their staff to single out **every** Muslim prisoner participating in the observance of Ramadan, including the Plaintiff, for pat searches including by Lubbehusen to offend their sincerely held religious beliefs and to discourage them from participating in the observance of Ramadan. The searches were inconsistent with the general practice whereby pat searches are conducted at random (as opposed to on everyone.

### SECOND CLAIM FOR RELIEF
### (ESTABLISHMENT CLAUSE VIOLATIONS)

232. Plaintiff hereby incorporates all prior paragraphs of this complaint as if fully set forth herein.

233. The Establishment Clause prohibits the government from favoring one religion over another without a legitimate secular reason.

-22-

234. The Establishment Clause also prohibits government officials from coercing a prison to hear or submit to religious views offensive to his religious beliefs.

235. Furthermore, the Establishment Clause prohibits the government officials from punishing a person for entertaing or professing religious beliefs.

236. The defendants' above described actions, practices, and policies violated the Establishment Clause of the First Amendment.

### THIRD CLAIM FOR RELIEF
### (EIGHTH AMENDMENT-DELIBERATE INDIFFERENCE)

237. Plaintiff incorporates every paragraph of this complaint as if set forth fully herein.

238. It is well established that Prison officials must provide provide special diets that are mediclly necessary.

239. Bureau of Prisons' Program Statement No. 4700.06, states that "the FSA will provide medical diets at all institutions as ordered by health services staff noted in the Program Statement **Patient Care**".

240. The Guidelines for medical diets for the Bureau of Prisons states that "The FSA [Food Services Administrator] will develope procedures to ensure that inmates who have a medical or special diet, or a supplemental feeding order, receive the proper food items".

241. The Guidelines also states that "the mission of the Food Services Branch is to provide inmates with meals that are nutritionally adequate, properly prepared, and attractively served".

242. Furthermore, the Guidelines states that "only the authorizing provider may discontinue orders for medical or special diets or supplemental feeding".

243. The Bureau of Prisons Regulation 28 C.F.R. § 541.12(4) state that a prisoner has a "right to health care, which includes nutritious meals".

244. During the period of time that Plaintiff was housed at USP-Terre Haute, he suffered from a number of serious medically diagnosed chronic conditions, including but not limited to pulmonary diseases due to lung cancer and asthma, gallbladder cholelithiasis, severe irritable bowel syndrome, gastroesphageal reflux disease, diverticulosis, diaphragmatic hernia, gastritis, gastric issues, and other several gastro-intestinal disorders, hypertension, vitamin D deficiency, allergies, sleep apnea, severe spinal stenosis with neurogenic claudication, and chronic fatigue syndrome.

245. diet plays a major role in managing Plaintiff's gastro-intestinal disorders, gallbladder cholelith-iasis, hypertension, and other medically diagnosed conditions.

246. Plaintiff was evaluated by Dr. Luke Webb, Allergist/Immunologist, who found that to better manage his IBS symptoms, Plaintiff would benefit from avoiding milk products, fried or greasy foods, food high in fiber, spicy foods, beans, peas, broccoli, whole kernel corn, peanut butter, spicy foods, caffeine, and corbonated beverages.

246. Plaintiff was also provided by the Bureau of Prisons medical staff printed handout materials issued by the Academy of Nutrition and Dietetics listing the food items that unsuitable for his IBS, GERD, and other GI disorders. For example, the printed handout materials states That "some foods can worsen IBS-related diarrhea. These include: Too much fiber, especially insoluble fiber found in the skin of fruits and vegetables, food and drinks with chocolate, alcohol, caffeine, fructose, or sugar substitute sorbitol, carbonated drinks, **large meals,** fried and fatty foods, food and drinks with dairy, foods with wheat...".

247. For gallbladder cholelithiasis, a medical specialist, instructed to avoid a low fat diet, dairy products, margarine and non-dairy spred, gluten-wheat; rye; oats; barley; and spelt, polyunsaturated vegetable oil derived from most seeds and nuts, sugar, and onions.

248. For GERD, the Academy of Nutrition and Dietetics and medical specialists, recommended to eliminate, among other things, caffeinated beverages, nuts and nut butters, high fat cheeses, milk, chocolate, fried foods, pastries and other high-fat desserts, and any fruits or vegetables that causes GERD symptoms. Also, recommended to avoid large meals and to divide the meal to smaller meals.

249. During the period of time that Plaintiff was housed at USP-Terre Haute, Dr. William Wilson-the Clinical Director, issued medical diet orders to accommodate Plaintiff's medical conditions.

250. In addition, the Federal Bureau of Prisons perviously entered into a settlement agreement with Plaintiff in another case requires the BOP, among other things, to take in consideration his medical restrications when making decisions regarding his future job and housing assignments and medical needs including **"special diet due to medical condition (lung removed)"** .

251. Plaintiff notified defendants Kruger, Underwood, Cox, Hunt, Kimberly, Gilliam, Floyd, Watson, Holliday, and Abrahims of the above diet restrictions and medical diet orders and provided them copies of the pervious legal settlement agreement and medical orders.

252. Plaintiff repeatedly asked the defendants to serve him foods comply with his medical dietary restrictions and needs but they refused without any legitimate justification other than to inflict pain and suffering upon him.

253. Defendants Holliday deliberately, willfully, and maliciously directed the food services staff to defy medical diet orders, and the pervious legal settlement with the BOP, and directed them to serve the Plaintiff all the food items that violates the medical orders to inflict pain and suffering upon him for retaliatory and racist reasons.

254. Defendants Kruger, Underwood, Cox, Hunt, Gilliam, Watson, and Abrahims also instructed the food services staff to deny the Plaintiff readily available foods comply with his medical dietary restrictions and needs.

255. Defendant Holliday also directed the food services staff to significantly and dangerously cut off the required calories served to him per day to inflict pain and suffering upon him.

256. Defendant Holliday, kruger, underwood, Cox, Hunt, Watson, and Abrahims also directed the food services staff and the correctional staff not to allow the Plaintiff to consume any of his food in his

cell to accommodate his medical dietary restrictions while allowing other inmates to take their meals back to their cells.

257. Defendants Kruger, Underwood, Cox, Hunt, Watson, Kimberly, and Floyd denied Plaintiff's requests to be allowed to purchase food items suitable for his medical needs and restrictions to unnecessary inflict pain and suffering upon him.

258. During the period of time that Plaintiff was housed at USP-Terre Haute, Plaintiff was repeatedly subjected to unnecessary humiliating, demeaning, dehumanizing, and embarassing strips searches in violations of his Fourth and Eighth Amendment rights.

259. There was no legitimate need to conduct such strip searches because USP-Terre Haute has a full body scanning machine and Plaintiff has no history of possession of contraband of any kind, no history of using or selling drugs, no history of smuggling anything to prison, or a history of violating any rule justifying the strip searches. (Please, see Paragraphs 140-162 of this complaint).

260. On many occassions, Plaintiff was subjected to humiliating three strip searches during one movement and despite the fact that he was under constant supervision by staff from the time of the first search to the third. For example, on 2-10-2018, Defendant Clark subjected the Plaintiff to humiliating three strip searches during one movement and one of three unnecessary strip searches was performed in full view of other inmates with obvious intention to offend Plaintiff's sincerely held religious beliefs and to humiliate him.

261. It is well established that an inmate cannot be forced to sacrifice one constitutionally protected right solely because another respected.

262. During the period of time that Plaintiff was housed at USP-Terre Haute, Plaintiff was forced to cancel scheduled outside medical appointments to avoid the humiliating strip searches.

263. Plaintiff repeatedly asked defendant BOP, Kruger, Underwood, Cox, Hunt, Roloff, and watson to exempt him from strip searches and the searches be performed the readily available full body scanning machine but they refused and directed that he be subjected to both strip searches and a full body scanning without any legitimate justification.

264. Defendants BOP, Kruger, Underwood, Cox, Hunt, Roloff, and Watson permitted, allowed, and/or condoned the humiliating and demeaning strip searches of the Plaintiff.

265. It is well-established that prison authorities violates the Eighth Amendment when they treat inmates in a way that is motivated by desire to harass and humiliate.

266. During the period of time that Plaintiff was housed at USP-Terre Haute, defendant Lubbehusen repeatedly singled out the Plaintiff for harassment, mistreatment, and humiliation without any provocation or legitimate reasons other than her racist beliefs against Plaintiff and his Islamic faith. (Please, see pp. 5, 13, 17-18, and 21).

267. In addition, she repeatedly deprived Plaintiff of his prescribed medications to inflict pain and suffering upon him for non-medical reasons.

-25-

268. After Plaintiff's repeated complaints against defendant Lubbehusen, she served him crushed to powder and diluted with water medications that made him sick and caused him symptoms including chest pain, dizzeness, headache, weakness, clouded vision, nausea, and a feeling of disorientation that his correct medications did not cause.

267. Defendant Lubbehusen also repeatedly incited other officers and inmates against the Plaintiff to cause him harm, and as a result, he was singled out by other officers for harassment and mistreatment. Also, she told other inmates that Plaintiff complained about them.

268. Defendant Lubbehusen prevented other readily available nurses to serve him his prescribed medications and repeatedly forced Plaintiff to choose between his medications be served by her or no medications be provided to him.

269. After approximately a year of countless complaints against her, defendant Lubbehusen fabricated stalking complaint against the Plaintiff with the intend to place his life and safety at risk.

270. The fabricated stalking complaint was made with actual malice and to inflict pain and suffering upon the Plaintiff.

271. Branding an inmate as a stalker can expose him to serious harm at the hand of other prisoners and correctional officers. Lubbehusen informed other inmates and staff that Plaintiff was stalking her.

272. In 2019, while Plaintiff was housed at USP-Terre Haute, a fellow prisoner (Dan Stevens) was killed by his cellmate in the SHU after a femal staff accussed him of improper behavior toward her.

273. Defefendant Lubbehusen forced the plaintiff to choose between his prescribed medications and his safety.

273. Plaintiff repeatedly forced to endure suffering and pain by not taking his prescribed medications to protect his life and safety from the continued efforts by defendant Lubbehusen to cause him harm.

274. Shortly after Lubbehusen filed her fabricating stalking complaint, Plaintiff was subjected to threats, intimidations, and harassment.

275. Defendants Underwood, Cox, Hunt, McCoy, Watson, and Dodge knew that the stalking complaint was false and the video-recordings of the area where Lubbehusen worked demonstrated the falesity of her claim but they approved, permitted, allowed, and/or condoned the fabrication by Lubbehusen and used it to unlawfully retaliate against Plaintiff and to transfer him to another institution.

276. Defendant Underwood, Cox, Hunt, McCoy, Watson, and Dodge denied Plaintiff's request to review the stalking complaint and refused to provide him a copy of it to prevent him from challenging it and because they were fully aware that the stalking complaint was false. In addition, no disciplinary report was issued against the Plaintiff to prevent him from having access to it through the disciplinary process.

277. Defendant BOP denied Plaintiff requests for a copy of the stalking complaint and refused to remove it from his prison records and as a result, Plaintiff is still unjustly and wrongfully classified as a stalker and his life and safety still at risk.

-26-

278. During the period of time that Plaintiff was housed at USP-Terre Haute, Plaintiff repeatedly asked defendants Kruger, Underwood, Cox, Hunt, Roloff, Dodge, McCoy, Kimberly, Watson, and others to protect him from Lubbehusen's unlawful and racist acts and her attempts to cause him harm but they did nothing to protect him from her.

279.   In addition, defendants Kruger, Underwood, Cox, Hunt, Mccoy, kimberly, and Watson denied Plaintiff's repeated request s to allow any other readily available medical staff to serve him his daily prescribed medications to protect him from Lubbehusen's repeated attempts to cause him harm.

280. Long before Lubbehusen fabricated the stalking complaint against the Plaintiff, he repeatedly warned defendants Kruger, underwood, Cox, Hunt, McCoy, kimberly, Dodge, and Watson that their refusal to take any action to protect him from her patterns of unlawful acts toward him would encourage her to fabricate disciplinary report against him.

281. Defendants Kruger, Underwood, Cox, Hunt, McCoy, Kimberly, and Watson tolerated mistreatment and abusive conduct by their staff, including Lubbehusen, directed at the Plaintiff and other Muslim and non-White prisoners, which led to physical harm and death of inmates.

282. On 2-9-2018, Plaintiff was placed in the Special Housing Unit for non-disciplinary reasons, while in the SHU Plaintiff was deprived of basic human needs and was forced to sleep on a half dirty mattress and given dirty sheet and towel and as a result he developed scalp disease and loss of hair.

283. Defendants Kruger and Kimberly were fully aware that most of the mattresses in the SHU at that time were dirty and damaged but they took no action to ensure that undamaged and clean mattress were available to inmates.

284. While in the SHU, Plaintiff was also deprived of his cpap machine and all his self-carry medications, including his three inhalers for his asthma and other lung conditions. Plaintiff notified defendants Kruger, McCoy, and others of his need for his medications and Cpap machine but they ignored him and took no action to ensure that he received his medications and Cpap machine.

285. While housed at the SHU, Plaintiff also notified defendant Kruger and others that the cell was very cold and specially at night time and that he needs sufficient bedding and cloths to protect him from the cold due to his asthma and the removal of his lung but Kruger ignored his request.

286. While at the SHU, Plaintiff also subjected to abusive behavior by Officers, including Officer Plester. The abusive and unlawful acts by the Officer in the SHU were known to defendants Kruger but he turned a blid eye to such abusive acts.

287. Plaintiff is suffering from a diagnosed visual impairment requiring prescribtion eye glasses.

288. Before his arrival to USP-Terre Haute, two eye glasses were prescribed for plaintiff, One for distance vision and one for reading.

289. On November 14, 2017, only the reading eye glasses was issued to Plaintiff.

290. During the period of time the period of time that Plaintiff was housed at USP-Terre Haute, he repeatedly asked defendants McCoy, Kruger, Cox, Underwood, and Hunt to provide him the prescribed the eye glasses for distance vision or to allow him to purchase it with his own money but they refused to

allow him to purchase it with his own money and it took them approximately a year and after count-
less complaints to provide him the prescribed eye glasses for his distance vision impairment with-
out any legitimate justification other than the desire to inflict pain and suffering upon him.

291. Prisoners retain the essence of human dignity inherent in all persons. Respect for that dignity
animates the Eighth Amendment prohibition against cruel and unusual punishment. The Basic concept
underlying the Eighth Amendment is nothing less than the dignity of man.

292. The misconduct described in this complaint as a whole was undertaken with deliberate indiffer-
ence to Plaintiff's rights and for no legitimate penological purpose.

293. At all material times, the acts or omissions of each defendant were subjectively unreasonable,
intentional, willful, malicious and violated Plaintiff's constitutional and statutory rights.

## FOURTH CLAIM FOR RELIEF
### (Slander and Slander Per Se against defendants Lubbehusen and Dodge)

294. Plaintiff hereby incorporates all prior paragraphs of this complaint as if fully set forth herein.

295. Lubbehusen knowingly and maliciously made false, defamatory, slanderous and unprivileged state-
ments to third parties via the statements Lubbehusen made in her January, 2019, fabricated stalking
complaint. She also falsely told other inmates that the Plaintiff was complaining to staff about them.

296. The knowingly false, defamatory, and unprivileged statements by defendant Lubbehusen were committed
knowingly, willfully, and maliciously with the intent to harm, injure, vex, harass, and oppress Plaintiff
and to place his life and safety at risk, and were callous and done in wanton and reckless disregard
of Plaintiff's rights.

297. Defendant Dodge knowingly and maliciously used the same false, defamatory, slanderous and unprivileged
statements to third parties via his request to transfer Plaintiff to USP-Allenwood and in his declaration
to the Court in another case.

298. The knowingly use of the same false, defamatory, and unprivileged statements that were fabricated
by Lubbehusen and were used by defendant Dodge in his request to transfer Plaintiff and in his false
declaration to the Court were used by defendant Dodge knowingly, willfully, and maliciously with the
intent to inflict pain and suffering, humiliation, and physical injuries on the Plaintiff, and were
callous and done in wanton and reckless disregard of Plaintiff's rights.

299. As a result of the misconduct described in this complaint by defendants Lubbehusen and Dodge,
Plaintiff suffered damages and harm.

## FIVE CLAIM FOR RELIEF
### (Defamation and Defamation Per Se Against Lubbehusen and Dodge)

300. Plaintiff hereby incorporates all prior paragraphs of this complaint as if fully set forth herein.

301. Defendants Lubbehusen and Dodge made and published false, defamatory and unprivileged statements
to third parties via the formal stalking complaint by Lubbehusen, and the request for transfer and the

fabricated declaration to the Court in another case, wrongfully accusing plaintiff of stalking defendant Lubbehusen.

302. As a result of the misconduct described in this complaint by defendant Lubbehusen and Dodge, Plaintiff suffered damages and harm.

### SIX CLAIM FOR RELIEF
**(Conspiracy to deny Plaintiff his Constitutional, Statutory, Regulatory, and Treaties Rights in violation of 42 USC § 1985)**

303. Plaintiff hereby incorporates all prior paragraphs of this complaint as if fully set forth herein.

304. All the Defendants, by engaging in the unlawful acts described in this complaint as a whole, agreed to deprive Plaintiff the equal protection of the laws, or the equal privileges and immunities of the laws.

305. All the individual defendants and others unknown at this time are liable to the Plaintiff for injuries and damages resulting from the fact that they tacitly or explicitly agreed and acted together in concert,and with others unknown at this time, to accomplish unlawful acts, namely, to deprive him of the religious rights and other constitutional and statutory rights described in this complaint, with the intent to cause him harm.

306. All the individual defendant conspired among themselves and others unknown at this time to deprive Plaintiff and other Muslim prisoners of their religious rights and to deprive Plaintiff of the other constitutional and statutory rights described in this complaint.

307. In furtherance of their conspiracy, the defendants and others unknown at this time gave encouragement and substantial assistance to each others and otherwise aided and abetted each otherwise aided and abetted each other in perpetrating the wrongful acts pleaded in this complaint and they agreed to substantially burden Plaintiff's and other Muslim prisoners' sincerely held religious beliefs.

308. Defendants have substantially assisted and encouraged one another in their wrongful actions against Plaintiff. In fact, there are hundreds of e-mails between individual defendants,who were involved in the wrongful acts mentioned against each one of them in this complaint, The emails will demonstrate, among other things, that they explicity agreed and acted together in concert, and with other individuals unknown at this time, to deliberately pertrating the wrongful acts pleaded in this complaint.

309. In addition, defendant Dodge and Holliday conspired among themselves and others to deliberately provide the Court in another case fabricated statements, under the penalty of perjury, to deprive plaintiff of his religious and medical rights.

310. Furthermore, there are emails between defendant Holliday and other defendants that demonstrates that they conspired to defy medical diet orders and to deprive Plaintiff of a diet comply with his sincerely held religious dietary laws and medical dietary restrictions.

311. The documentary evidence, including emails between the defendants, will demonstrate that the defendants acted with racial and religious animus toward Plaintiff.

-29-

312. All the individual defendants knowingly conspired and were aware, through grievances; complaints; emails; and direct conversations, of the conspiracy to deprive Plaintiff of his constitutional rights.

313. All the individual defendants condoned and participated in this conspiracy by taking direct actions in furtherance of the conspiracy.

314. Defendants' conspiracy to violate Plaintiff's constitutional, statutory, regulatory, and treaties protected rights was and is intended to retaliate against and punish plaintiff for exercising his rights and for asking that his religious beliefs be respected and accommodated as other non-Muslim prisoners' religious beliefs were and are being respected and accommodated, to silence Plaintiff from exercising those rights, and to place a chilling effect upon him and other Muslim prisoners who may chose to exercise such rights.

## SEVEN CLAIM FOR RELIEF
### (Failure to prevent or to aid in preventing any of the wrongs described in this complaint and the conspiracy claim in violation of 42 USC § 1986)

315. Plaintiff hereby incorporates all prior paragraphs of this complaint as if fully set forth herein.

316. All individual defendants knowingly conspired and was aware of the conspiracy to deprive plaintiff of his rights but neglected, refused, or failed to act to prevent the conspiracy to deprive him of his rights, notwithstanding their power to prevent or aid in preventing the commission of the violations of Plaintiff's rights in violation of § 1986.

317. As a direct and approximate consequence of the aforementioned acts and omissions on the part of the defendants, jointly and severally, the Plaintiff was deprived of his constitutional and statutory rights, privileges and immunities.

## EIGHT CLAIM FOR RELIEF
### (DENIAL OF AGENCY RECORDS ESSENTIAL TO THIS LITIGATION AND FUTURE AMENDMENT OF THE COMPLAINT IN VIOLATION OF 5 U.SC. § 552 and 552 (a) )

318. Plaintiff hereby incorporates all prior paragraphs of this complaint as if fully set forth herein.

319. This claim under the FOIA/PA against defendant BOP to order the production of agency records that are essential to this litigation, future amendment of the complaint, and to identify the unknown individuals involved in the conspiracy.

320. Defendant BOP is an agency of the United States, and it has possession and control over the record requested by the Plaintiff.

321. By letter mailed on 11-7-2018, Plaintiff requested a copy of all the electronic messages (emails) and all attachments to them, sent or received by defendant Mitchell Holliday relating or referring in any way to Plaintiff. Defendant BOP denied the request asserting  inapplicable Exemptions. On          , 2019, the Office of Information Policy (DOJ) remanded Plaintiff's FOIA/PA request to BOP for further processing but the BOP ignored the remand and never provided the requested documents nor communicated with the Plaintiff since the remand at all regarding his request.

322. By letter mailed on 5-7-2019, Plaintiff requested a copy of all electronic communications of defendant Scott Abrahims regarding Plaintiff. The defendants BOP denied the request asserting inapplicable Exemption. On          , the Office of Information Policy (DOJ) remanded Plaintiff's FOIA/PA request to BOP for Further processing stating:

"After carefully considering your appeals, and as a result of discussion between BOP personne and this Office, I am remanding your requests to [for access to records concerning electronic communications of Mitchell Holliday and Scott Abrahims regarding yourself] BOP for further processing. Although BOP invoked Exemption 7(A) of the FOIA, 5 U.S.C. § 552(b)(7)(A), at the time your initial requests were processed, that exemption is no longer applicable to withhold the records in full. Consequently. BOP will process and send all releasable records to you directly ...".

The defendant BOP never released any records to Plaintiff nor communicated with Plaintiff since the Office of Information Policy remanded his requests to BOP for further processing. **At least seven month since the Office of Information Policy remanded Plaintiff's requests to BOP for further processing.**

323. The Plaintiff has the statutory rights to the requested records and there is no legal basis for the defendant's refusal to disclose them to the Plaintiff.

## NINE CLAIM FOR RELIEF
### (Defendant BOP knowingly maintaining fabricated stalking complaint against Plaintiff in violation of 5 U.S.C. § 552(e)(5))

324. Plaintiff hereby incorporates all prior paragraphs of this complaint as if fully set forth herein.

325. The BOP violated § 552a(e)(5), which provides that each agency covered by the Privacy Act shall "maintain all records whichare used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness as to the individual in the determination".

326. As perviously described in this complaint, the Bureau staff member Lubbehusen fabricated the stalking complaint to punish the plaintiff, to place his future life and safety at risk, and to retaliate aginst him for his countless complaints against her racist and unlawful acts against him.

327. Video-recordings and other documentary evidence will support a finding that defendant **Bureau staff** member willfully and intentionally fabricated the stalking complaint.

328. Bureau staff members used **and relied** on the fabricated stalking complaint to transfer Plaintiff out of the religious program (the Life Connections Program), to deprive him of his religious rights, and used it and other fabricated information to deprive Plaintiff of relief from the Court.

329. The fabricated stalking complaint adversely affected plaintiff in several ways including, but not limited to, placing his life and safety at risk, depriving him from completing the Life Connections Program, depriving him of the ability to perform community services, to perform some of his daily obligatory group prayers with other Muslim inmates in the designated LCP's group prayer room, transferring him to institution that unwilling to accommodate his sincerely held religious beliefs, and wrongfully branding him as a stalker.

330. Defendant BOP denied all Plaintiff's administrative remedies to expunge the fabricated stalking complaint from all his files and records and denied his requests to at least review the fabricated complaint

or that the fabricated allegations be read to him because the Defendants at USP-Allenwood were fully aware that the allegations were fabricated with their approval.

331. Plaintiff also repeatedly requested, both verbally and in writing, that the video-recordings of the Pill-Line be preserved for this litigation because they will demonstrate, beyond any doubt, that the stalking complaint was fabricated. Had the stalking complaint was true, Plaintiff would have received a disciplinary action against him.

## TEN CLAIM FOR RELIEF
## (First Amendment – Retaliation Claim Against Defendants Holliday, Abrahims, Hunt, Cox, Watson, Lubbehusen, Dodge, McCoy, and Kruger)

332. Plaintiff incorporates every paragraph of this complaint as if set forth fully herein.

333. Because retaliation claim **under Bivens** has not been foreclosed in the Seventh Circuit, Plaintiff pleads it here, to preserve it for appeal. See, **Snadi v. True,** 783 F.App'x 633 (7th Cir. 2019)(remanding so that district court can develop full record with **recruited counsel** on whether Bivens-style damages remedy is available for alleged violation of prisoner's First Amendment rights after Ziglar v. Abbasi, 137 S.Ct. 1843, 198 L.Ed.2d 290 (2017)); and **Hass v. Noordeloos,** 792 Fed.Appx. 405 (7th Cir. Jan 30,2020) (same).

334. In the manner described more fully above, Plaintiff engaged in protected First Amendment activity, namely complaining and filing grievances against the defendants for violating his constitutional and statutory rights, the defendants caused him to suffer constitutional and statutory rights deprivations in retaliation for his complaints and grievances and to deter further First Amendment activity, and this First Amendment activity was the motivating factor in defendants' decision making and actions.

335. The misconduct described in this complaint was undertaken with deliberate indifference to Plaintiff's rights.

336. As a result of the misconduct described in this complaint, Plaintiff suffered damages.

## Request for Relief

WHEREFORE, Plaintiff respectfully request relief as follows:

1. Compensatory and/or punitive damages in an amount to be proven at trial as to each and every claim;

2. An injunction against the BOP only for the claims specifically named the BOP as a defendant;

3. A declaration that defendants violated Plaintiff's Constitutional and Statutory rights;

4. Expungement of all records relating or referring to the fabricated stalking complaint;

5. Ordering the BOP to release to the Plaintiff the requested FOIA/PA records;

6. Trial by Jury; and

7. Such other and further relief as the Court deems just and proper.

## Declaration

I, Ahmad M. Ajaj , declare under the penalty of perjury, pursuant to 28 U.S.C.§ 1746, that all the facts in this Complaint are true and correct to best of my personal knowledge.

Dated: May 4, 2020.

Respectfully Submitted,

Ahmad M. Ajaj
#40637-053
USP-Allenwood
P.O.Box 3000
White Deer, PA 17887

-33-